Smith, P. J.
The indictment alleges, and the evidence warrants, the finding that the defendant was married to Marie Harrer, at Schwertneitz, in Prussia, in July, 1868, and that, in June, 1882, while said Marie was living, he married Carrie Dietz, in the city of Buffalo. He was thus, apparently, within the statute which enacts that every person having a husband or wife living, who shall marry any other person, whether married or single, shall, except in the cases specified in the next section, be adjudged guilty of bigamy. 2 R. S., 687, § 8. The next section provides that "the enactment above stated shall not extend to certain persons or cases, specified in the several subdivisions of said section, the first of which is as follows: “To any person, by reason of any former marriage, whose husband or wife, by such marriage, shall have been absent for five successive years, without being known to such person, within that time, to be living.” At the trial it was attempted to show that the defendant was within that exception. The following facts appeared: About four years after his marriage with Marie Harrer, he and his wife emigrated to America, reaching Hew York in May, 1872, and stopped with a Mr. Wunder till the following August. They then went to Pat *258 terson, N. J., where defendant was employed in a silk manufactory, and remained there till May, 1873, when defendant went to Troy and obtained employment in a shirt factory, and his wife returned to New York and was employed in Wunder’s family as a nurse to his children. In September of that year defendant returned to New York, and in February, 1874, he went to Detroit, Michigan, leaving his wife in New York His wife knew of his going there, advised it, supplied him with money of her own to pay his fare, and accompanied him to the depot, in Jersey City, when he left. She testified that they talked the mattter over, and agreed that it was best for him to go to Detroit; that he wished her to go with him; that she did not want to go with him, because she did not trust him; and that she told him that if, in one year, he could show her that he could get a situation in which he could support her, she would go there; that he need not send her anything, she would take care of herself. He wrote her several letters in the course of the first six weeks after reaching Detroit, in one of which he informed her that he had a good position, asked her to come to him and proposed to pay her fare. She answered that six weeks was not sufficient proof, and that was the last of their correspondence., Mrs. Meyer remained in the family of Wunder and her husband’s letters to her were addressed to Wunder’s. care.
Meyer obtained employment in Detroit for a few months, and there is some evidence tending to show that he then went to Canada, but how long he remained there does not. distinctly appear. He never wrote to his wife after he left Detroit, nor did he inform her of his leaving there. He testified that he was employed in Buffalo for a billiard company from 1880 to 1884, and that he formed the acquaintance of Miss Dietz in the fall of 1881, but she testified that their acquaintance began in 1875.
The defendant testified that in 1877 he went to New York and searched for his wife Marie. He sent a note to Wunder’s store addressed to her, requesting her to meet him at a place named; she received the note but did not go, and sent Wunder to say to defendant that she did not want to see him; that she wanted to be separated from him. The defendant testified that Wunder met him and told him he did not know where Mrs. Meyer was. He also testified that Wunder had previously forbidden him to come to his house. He also testified that in the fall of 1881, and again in March or April, 1882, he went to New York and made search and inquiries for his wife, but did not see her or learn anything about her. It appeared that Marie lived, in Wunder’s family till October, 1883, but that the family *259 moved several times and occupied different residences in the city during that period.
She testified that part of the time she kept a kindergarten school in the city, and advertised the same, over her own name, in a newspaper called the Staats Zeitung, for five or six months “during the years 1879-1883 inclusive.”
It appeared that defendant never told Miss Dietz he had been married previously. They lived together as man and wife at Buffalo till the morning of the 3d of May, 1886, when he left her to go down town, as she supposed, and she never saw him again, nor heard from him, till she saw him in the court room at his trial.
The defendant testified that when he left oh that occasion he went to St. Catharines, Canada, without baggage, as he “saw the whole matter about having a wife come out in the papers.” From there he went to New York, by rail, by way of Niagara Falls, and from there to Berlin, Germany, and came back six or seven weeks before the trial, when he was arrested. He also testified that in 1884 a cousin of his wrote him that his wife was living, and he continued living with his second wife two years after that without telling her.
It is not very material, as the case stands, to inquire which of the parties to the first marriage absented himself or herself from the other, or whether the defenant, in case he is to be held, to have absented himself from his wife, is for that reason deprived of the benefit of the exception to the statute above referred to. In view of the aspect in which the case was submitted to the jury, as will be seen presently, the more material questions relate to the defendant’s knowledge that his wife was living during her absence from him for five successive years, next preceding his second marriage. The trial court charged, in substance, that the defendant must have believed that his wife was not living in order to bring himself within the exception. The appellant’s counsel contend that such instruction was erroneous in that it imposed upon the defendant the burden of establishing a fact which the statute does not make an element of the exception. In support of their position they refer to section 299 of the Penal Code, which, although it took effect subsequently to the commission of the alleged offense, and, therefore, does not control the case, they suggest, throws light upon the meaning of the previous statute which it supersedes.
That section, in express terms, makes such belief an element of the exeption. But we do not regard it as a change of the law. We conceive that it is simply declaratory of that which, by proper interpretation, was the meaning of the prior statute. It would be absurd to hold the defend *260 ant innocent, within the intent of the former statute, if he contracted a second marriage, his first wife being in fact alive and he not believing her to be dead.
Although the defendant may not have had actual knowledge that his wife was living, yet, she being alive, if he had reason to believe, and did believe, that such was the fact, he was guilty of bigamy in contracting the second marriage. The second marriage must have been contracted in good faith in order to exempt the party.
The Penal Code has introduced no new rule in this respect, but has written out what before was implied. See Cropsey v. McKinney, 30 Barb., 47, per Sutherland, J., bottom of page 54 and top of page 55.
There was evidence in the case warranting the conclusion that when the defendant contracted the second marriage he did not believe his first wife was dead. His concealment from his second wife of the facts of his first marriage, and of the fact that his first wife was living, and his flight when he saw that his duplicity was about to be exposed, were sufficient, with the other circumstances, to authorize the finding of a guilty intent.
We have examined the several exceptions taken during the progress of the cross-examination of the defendant. Many of the questions specified in the points of the appellant's counsel were not objected to. In respect to others, the witness was instructed by the court that he need not answer if an answer would tend to convict him of a crime, and after being so instructed he declined to answer. Each of the questions of that class called for a fact, and not for a mere charge or accusation, and, in our opinion, was within the range of a legitimate cross-examination. To all the other questions specified in the points, the answers rendered were negative and harmless. None of the exceptions to the rulings admitting testimony point to error.
The defendant testified that in 1881 he had a conversation with a lawyer in New York name Nagel in reference to his rights in this matter. He was then asked whether he stated to Nagel that his wife had been gone over five years; that he had made a diligent search in New York city and elsewhere to ascertain her whereabouts, and that he was unable to ascertain her whereabouts, and that he believed she was dead; also, whether Nagel said to him at that time that he had a perfect right to marry. The questions were objected to, the objections sustained, and the defendant’s counsel excepted. We think the ruling was not erroneous. The advice was given upon the statement made by the defendant to his counsel, one of the ingredients of which was that he believed his wife to be dead. The testimony offered had no bearing upon the material question whether he *261 so believed in fact, and it was, therefore, wholly immaterial. If he believed his wife to be dead, that fact, established to the satisfaction of the jury, would have constituted a defense, and so the jury were instructed in substance; if he did not so believe, the advice which he obtained by making a false statement in that respect could not shield him from the consequence of his acts.
There is a class of civil cases where, upon the question whether a party believed that he had a good cause of action, as in a defense to an action for malicious prosecution, or whether a purchase alleged to be fraudulent was made in good faith, where testimony that the party received legal advice before acting has been received. Among them . are Jackson v. Mather (7 Cow., 301); Hall v. Suydam (6 Barb., 83); and Sherman v. Kortright (52 Barb., 267), cited by the defendant’s counsel. But they are distinguishable from the present case by reason of the features of the latter already stated.
We think the judgment should be affirmed.
Haight, Bradley and Lewis, JJ., concur.